1                    **UNITED STATES DISTRICT COURT**

2                         **DISTRICT OF OREGON**

3                         **PORTLAND DIVISION**

4  BARBARA PAULSON,                      )
                                         )
5              Plaintiff,                )    No. 03:11-cv-00556-HU
                                         )
6  vs.                                   )
                                         )
7  MICHAEL J. ASTRUE,                    )  **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security,      )
8                                        )
               Defendant.                )
9         _____

10

11  H. Peter Evans
    Steven J. Munson
12  H. Peter Evans PC
    308 SW First Avenue, Suite 200
13  Portland, OR 97204

14       Attorneys for Plaintiff

15

16  S. Amanda Marshall
    United States Attorney
17  Adrian L. Brown
    Assistant United States Attorney
18  1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2904
19
    David Morado
20  Regional Chief Counsel, Region X, Seattle

21  Daphne Banay
    Special Assistant United States Attorney
22  Office of the General Counsel
    701 Fifth Avenue, Suite #2900 M/S 901
23  Seattle, WA  98104-7075

24  Keith D. Simonson
    Special Assistant United States Attorney
25  Social Security Administration
    Office of the General Counsel
26  1301 Young Street, Suite A702
    Dallas, TX 75202
27
         Attorneys for Defendant
28

    1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Barbara Sue Paulson seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq*. Paulson argues the Administrative Law Judge ("ALJ") erred in finding her testimony not to be fully credible, discounting her husband's lay testimony, and improperly rejecting the opinion of her treating healthcare provider. *See* Dkt. # 19.

## I.   PROCEDURAL BACKGROUND

Paulson protectively filed her application for DI benefits on September 15, 2008, at age 47, claiming disability since May 28, 2008, due to chronic pain in her tailbone, shoulders, neck, and back.   She also alleges impairments including chronic, severe constipation; degenerative disc disease of the lumbar spine; depression; migraine headaches; nicotine dependence; aortic valve regurgitation; ovarian cysts; insomnia; and problems with memory and concentration.   (A.R. 18, 20, 39, 145, 165[1])   Paulson's application was denied initially and on reconsideration.   (A.R. 92-96, 98-101)   She requested a hearing, and a hearing was held on January 15, 2010, before an ALJ.   Paulson testified on her own

---

[1]The administrative record was filed electronically using the court's CM/ECF system.   Dkt. #14 and attachments.   Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #14-3, Page 19 of 82); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency.   Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

behalf.   Also testifying were Paulson's husband Charles, and a Vocational Expert ("VE").  (A.R. 33-74)  On February 3, 2010, the ALJ issued his decision, denying Paulson's application for DI benefits.  (A.R. 15-29)  Paulson appealed the ALJ's decision, and on March 7, 2011, the Appeals Council denied her request for review (A.R. 1-4), making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  Paulson filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying her application for benefits. Dkt. #2.  The matter is fully briefed, and the undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.   FACTUAL BACKGROUND

### A.   Summary of the Medical Evidence

On September 20, 2004, Paulson was seen by a doctor at a Kaiser Permanente clinic[2] for complaints of chronic coccyx and sacroiliac pain.  She was referred to a rehabilitation specialist. (A.R. 289)

On October 16, 2004, Paulson was seen in the emergency room for complaints of acute pain in her lower back, and an acute lumbar strain.  She received a prescription for Percocet, and was directed to follow up with her regular doctor.  (A.R. 290)  On October 21, 2004, Paulson was referred for physical therapy in connection with a diagnosis of sacral/coccyx pain.  (A.R. 298-99)

---

[2]Unless otherwise identified, all of Paulson's treating sources have been associated with Kaiser clinics and hospitals.

3 - FINDINGS & RECOMMENDATION

1    The next evidence of medical treatment for Paulson is nineteen
2  months later, when she saw family practitioner Susan Blake, M.D.,
3  on May 2, 2006, with a complaint of "worsening coccygeal/pelvic
4  pain." (A.R. 227)  Notes indicate ovarian cysts had been seen on
5  an MRI, and she was scheduled for an ultrasound.  She was taking
6  extended-release morphine, which she stated made her "'fuzzy' and
7  unable to focus," and she stated she did better on oxycodone.
8  (A.R. 227)  Cyclobenzaprine was added to her medication regimen.
9  (*Id.*)  Paulson was noted to be 5'5" tall, and at the time of this
10 visit, she weighed 163 pounds.  (A.R. 229)

11   The ultrasound of Paulson's pelvis was performed on May 4,
12 2006, and showed "[p]robable small debris-containing or hemorrhagic
13 cysts or follicles within the ovaries." (A.R. 235)  On May 12,
14 2006, Paulson saw gynecologist Lydia Helen Collins, M.D. for
15 followup regarding the ovarian cysts.  The doctor indicated it was
16 unlikely that Paulson's chronic coccyx-area pain was caused by the
17 cysts, and she directed Paulson to have the cysts rechecked in six
18 months to a year.  (A.R. 226-27)

19   On June 1, 2006, Paulson saw Physical Medicine and Rehabilita-
20 tion Specialist Jean M. Wyles, M.D.  Dr. Wyles administered a local
21 corticosteroid injection in the area of Paulson's coccyx.  (A.R.
22 226)  The injection only provided about one day of relief, and
23 Dr. Wyles administered a second injection on June 22, 2006.
24 (A.R. 225-26)  The doctor noted that if this injection was not
25 helpful, she would consider prescribing a course of oral steroids,
26 which Paulson indicated had been helpful in the past.  (A.R. 226)

27   On June 27, 2006, Paulson saw gynecologist Wendy J. Smith,
28 M.D. for a second opinion "regarding ovarian cysts and severe low

4 - FINDINGS & RECOMMENDATION

1  back pain/coccydynia." (A.R. 224)  Paulson's weight had increased
2  to 170 pounds. (A.R. 229)  Paulson described a three-year history
3  "of daily severe and worsening 'tailbone' pain," worse when she was
4  sitting and getting up. (A.R. 224)  She had received some
5  injections, but the pain had gotten worse, and now was "constant."
6  (*Id.*)  When she had an MRI to evaluate this pain, an ovarian cyst
7  was identified, and the physiatrist questioned whether the cyst
8  could be the source of Paulson's pain.  In addition, Paulson
9  reported being extremely constipated, with a bowel movement only
10 about once every two weeks.  She was taking oxycodone regularly for
11 her pain.  Dr. Smith did not believe the cysts needed any further
12 evaluation.  She also did not believe the cysts were the source of
13 Paulson's tailbone pain, noting it would be "unusual for coccydynia
14 to be so limiting." (A.R. 224)  However, she noted it was possible
15 that scarring from Paulson's prior surgeries (including a hysterec-
16 tomy) might be an issue. (A.R. 225)

17     On Saturday, July 8, 2006, Paulson was seen at an urgent care
18 clinic for a complaint of low back pain.  (The progress note does
19 not indicate who saw Paulson on this occasion.  *See* A.R. 223.)
20 Paulson was "on chronic narcotic therapy," taking four 5 mg
21 oxycodone pills every three hours for pain.  She had received 160
22 pills at the end of June, and stated she had run out the previous
23 Wednesday.  She had been told to see her primary care provider,
24 Susan Blake, M.D., that Wednesday, which she "forgot" to do, and
25 she was "[r]equesting a narcotic injection," which was denied.
26 (A.R. 224)  She was given 30 oxycodone pills, "and told she
27
28

absolutely must follow up with [Dr. Blake] on Monday." (*Id.*)
There is no indication in the Record that she complied with this
direction.

On February 15, 2007, Paulson talked with Dr. Blake by phone
regarding complaints of fatigue. Paulson stated, "I'm all of a
sudden having a hard time functioning." (A.R. 337) She was
sleeping for two or three days at a time, but then at other times
she was unable to sleep. Paulson stated this cycle had been
ongoing for several months, she was missing work, and her family
members were becoming concerned. The doctor ordered lab tests to
rule out any metabolic explanation for Paulson's symptoms. If labs
were normal, then she opined Paulson's depression might not be
treated adequately, noting her narcotic pain medications could make
her depression worse. (*Id.*)

On February 28, 2007, Paulson talked with Dr. Blake by phone
to discuss symptoms of weakness, fatigue, and sleeping constantly.
She also requested a note for work. The doctor noted Paulson's
antidepressant medication had been changed to Celexa on
February 15, 2007. Paulson's lab results were normal, and the
doctor referred Paulson to a neurologist "to check for causes of
hypersomnia." (A.R. 336) She also switched Paulson from Celexa to
Prozac (fluoxetine). (*Id.*)

On May 25, 2007, Paulson saw Physical Medicine and Rehabili-
tation specialist James Y. Kim, M.D. for consultation regarding her
ongoing tailbone pain. Paulson's weight had increased to 176
pounds. (A.R. 228) Paulson gave the following history of her
tailbone pain:

6 - FINDINGS & RECOMMENDATION

> The patient states that about 4 years ago she went on a salmon fishing trip. She was sitting on a hard surface as they were going out on the boat. The boat was on some choppy waters, going at high speeds, and she remembers repeatedly bouncing up and down on a hard surface right on her tailbone. Then she spent several hours just sitting on that same spot, and ever since then she has had pain in her low back. At first the pain was only present when sitting on a hard surface. Over the years it has gradually worsened, and now her pain is constant. It involves an area which seems to correspond to her entire sacrum. It will hurt whether she is sitting or standing. She describes the pain as like a severe ache. She rates it 8 over 10. She denies any paresthesias in her lower extremities or saddle anesthesia, denies any weakness in her lower extremities, denies any bowel or bladder incontinence. It seems to decrease when she is able to apply heat. She is also taking oxycodone to relieve her symptoms. It does not seem to change with bending, lifting, twisting, coughing, or sneezing. She is currently using up to 784 tablets of oxycodone a month [i.e., 26 pills per day]. These are 5 mg tablets. She has never been to see a chiropractor or physical therapist. She did come to see one of our colleagues who tried triple injections near the tailbone, and this did give her some relief for perhaps a few days at most; however, it was not much more than that. She states she has had oral prednisone and this actually gave her more relief than anything else.

(A.R. 221) Notes also indicate Paulson's past medical history was "[s]ignificant for aortic insufficiency, migraine headaches, depression, [and] coccydynia [i.e., tailbone pain]." (*Id.*)

Paulson's current medications at the time of this visit included, *inter alia*, oxycodone (a narcotic pain medication), fluoxetine (an antidepressant), cyclobenzaprine (a muscle relaxant), lorazepam (an anti-anxiety medication), Topamax (a medication used to treat migraines, among other things), citalopram (another antidepressant), and nifedipine (a calcium channel blocker, used to

7 - FINDINGS & RECOMMENDATION

1  treat angina).[3]  (*Id.*)  Paulson reported smoking half a pack of
2  cigarettes a day.  She was unemployed, stating she "spen[t] her
3  time taking care of her grandson."  (A.R. 222)

4      On examination of Paulson's back, the doctor noted no redness
5  or swelling.  Paulson exhibited "tenderness to palpation over the
6  SI joints and over the buttocks bilaterally[,]" but pressure over
7  her coccyx area did not elicit tenderness.  (*Id.*)  Her ranges of
8  motion were flexion 89 degrees, extension about 20 degrees, and
9  lateral flexion 20 degrees bilaterally.[4]  She exhibited no
10  tenderness with movement of her hips, and all ranges of motion for
11  her hips were within normal limits.  The doctor noted an MRI of
12  Paulson's sacrum and coccyx "showed some areas of fatty marrow but
13  otherwise was read as normal."  (*Id.*)

14      Dr. Kim noted the following assessment from his examination of
15  Paulson and review of her MRI results: "Low back pain possibly
16  secondary to coccydynia, SI (sacroiliac) joint pain, piriformis
17  syndrome, or a combination of any of these.  I also cannot
18  completely rule out discogenic pathology although this seems very
19  unlikely."  (*Id.*)  He recommended a caudal epidural steroid injec-
20  tion; directed Paulson to use a lumbar support when sitting, and

---

23  [3]Information on all of these medications was obtained from
24  www.rxlist.com.

25  [4]The Oregon Department of Consumer and Business Services,
Workers' Compensation Division, has adopted norms established by
26  the AMA Guides for spinal ranges of motion.  The norms for lumbar
ranges of motion are flexion 60 degrees, extension 25 degrees, and
27  lateral flexion 25 degrees bilaterally.  *See* www.cbs.state.or.us/
external/wcd/rdrs/mru/forms.html (visited Sept. 24, 2012) (forms
28  2278C, 2278L, and 2278C).

1  try to stay off her coccyx as much as possible; and directed her to
2  perform stretching exercises for several weeks.  (*Id*.)

3      Dr. Kim administered an epidural steroid injection on June 29,
4  2007, with "no immediate complications."  (A.R. 220)  Paulson saw
5  Dr. Kim on August 31, 2007, reporting that "the last injection did
6  not help very much."  (A.R. 218)  Dr. Kim administered another
7  epidural injection.  (A.R. 218-19)

8      On September 18, 2007, Paulson talked with Dr. Blake by phone
9  regarding her ongoing coccyx pain.  Paulson stated the steroid
10  injections had not helped.  She asked for a prescription for Valium
11  to use as needed to help her sleep.  (A.R. 331)

12      On October 15, 2007, Paulson began tapering off oxycodone and
13  started taking methadone.  Dr. Blake followed up with Paulson by
14  phone on October 24, 2007.  The doctor opined Paulson "might
15  benefit from Pain Clinic pain classes."  (A.R. 329)  On Novem-
16  ber 20, 2007, Paulson called Dr. Blake, and reported her coccyx
17  pain was returning since she had stopped the oxycodone.  (A.R. 328)

18      On December 15, 2007, Paulson saw Physician's Assistant
19  Christine F. Legler to have a painful, infected boil drained.
20  Paulson's weight had increased to 185 pounds.  (A.R. 228)
21  Paulson's prescription for oxycodone was refilled, and she also
22  received a prescription for an antibacterial medication.  (A.R.
23  217-18)

24      On March 12, 2008, Paulson saw family practitioner Xianghong
25  Zhu, M.D. with complaints of neck pain and stiffness, associated
26  with right shoulder and arm pain for three weeks.  Paulson stated
27  it was painful to use her arm, and the pain was affecting her
28  sleep.  She also had some mild numbness in her right index finger.

9 - FINDINGS & RECOMMENDATION

She was taking Ibuprofen and Flexeril, without any significant relief. (A.R. 215-16) Paulson's weight had increased to 189 pounds. (A.R. 228) On examination, the doctor noted moderate muscle spasms and tenderness to palpation along Paulson's shoulder and upper back muscles, as well as significant tenderness along the lateral aspect of Paulson's right upper arm, where "palpation put her into tears for which she apologized profusely." (A.R. 216) Her upper extremity strength was within normal limits, although she complained of moderate pain with motion. Dr. Zhu ordered tests and x-rays, and prescribed pain medications and physical therapy. (*Id.*)

On March 28, 2008, Paulson talked with Dr. Blake to request a change in her medications. She stated the long-acting pain medications were not working well, and she wanted to try taking Vicodin for "half of her pain meds." (A.R. 25) The doctor wrote new prescriptions for Paulson's medications. (*Id.*)

Paulson was seen in the ER on May 5, 2008, with complaints of an exacerbation of her low back pain in the right side, radiating down the back of her thigh but not below her knee. (A.R. 354-55) An x-ray examination was normal for her age, showing "[n]o significant subluxation and no remarkable focal osseous abnormalities." (A.R. 234) Paulson was treated with 2 mg of IM Dilaudid, 1 mg of IM Ativan, and then another 2 mg of IM Dilaudid. She had "good improvement in her discomfort," and was discharged with a prescription for Dilaudid 2mg to 4 mg every six hours as needed for breakthrough pain. (A.R. 355-56)

On May 6, 2008, Paulson saw Internal Medicine specialist Michele D. McCallum, M.D. for followup. Paulson's weight was down

10 - FINDINGS & RECOMMENDATION

slightly, to 186 pounds.  (A.R. 228)  Paulson stated her tailbone pain was "excruciating," and so severe that she could not live with it any longer.  (A.R. 215)  She stated it was "worsening her depression."  (*Id.*)  Steroid injections had not been helpful, and she was frustrated at having to take high doses of pain medications.  The doctor referred Paulson to a physiatrist, and recommended trials of a TENS unit and acupuncture.  She noted Paulson was not a candidate for chiropractic treatment at that time due to secondary radicular symptoms, but Paulson noted this was the first time she had experienced those symptoms, so the doctor opined chiropractic treatment might be an option in the future.  (*Id.*)  Paulson's medication records indicate she was still taking narcotic pain medications at this time (A.R. 213), and she had signed a pain contract (A.R. 215).

On June 12, 2008, Paulson saw Dr. Kim for followup of her ongoing tailbone pain.  Paulson stated she had been seen in the ER for an exacerbation of her pain, with radiation into the right femoral area and the anterior thigh.  She stated it took two injections before the pain improved.  She vomited "several times" the next day, and then felt better.  She was obtaining limited relief from acupuncture, but two to three days after a treatment, her pain would return.  She stated the pain was present throughout her lower lumbar spine, usually without radiation, although she sometimes felt weakness in her legs.  The doctor ordered a bone scan.  He noted that if the scan was "not helpful," then he would "consider SI joint injection and possibly further imaging of the actual lumbar spine itself."  (A.R. 214)

/ / /

11 - FINDINGS & RECOMMENDATION

On July 8, 2008, Paulson had a bone scan to evaluate her six-year history of coccygeal pain, and low back pain.   The study showed "[n]o vertebral, sacral, or coccygeal osteoblastic abnormality . . . and no lumbosacral abnormality. . . ." (A.R. 233)

On August 4, 2008, Paulson talked with Susan Blake, M.D. by phone regarding Paulson's back pain and depression.   Paulson had "sent another long, desperate-sounding . . . message, relating worsening of her back pain and fatigue, inability to get out of bed and function." (A.R. 323)  Paulson stated she was okay while lying down with a heating pad, but as soon as she stood up for any length of time, her low back pain worsened, and her legs felt weak.   The doctor indicated an MRI of her lumbar spine would help determine whether there was some spinal stenosis causing Paulson's symptoms. Paulson had been quite depressed, which the doctor did not find surprising, noting Paulson previously had been "a very active woman, and now can do hardly anything without pain." (*Id.*)   The doctor ordered a trial of Effexor, and discontinued the Prozac (fluoxetine). (*Id.*)

Paulson had an MRI of her lumbosacral spine on August 18, 2008.   The study showed "mild multilevel degenerative changes within the lumbar spine," but "[n]o advanced stenoses or definite neural impingement." (A.R. 232)

On November 20, 2008, clinical psychologist Dorothy Jean Anderson, Ph.D. reviewed the record and completed a Psychiatric Review Technique form.   (A.R. 249-62)   Dr. Anderson indicated Paulson's "medical records suggest her depression stems primarily from her chronic coccyx pain, which has been present since [approximately] 2003. . .   Neither pain nor depression prevented

12 - FINDINGS & RECOMMENDATION

1  her from continuing gainful employment up to 5/28/08." (A.R. 261)

2  She noted Paulson had not evidenced any "problems with concen-

3  tration, comprehension, or formulating answers to questions" during

4  her telephone claim interview by a Social Security representative,

5  and progress notes did not show any "significant impairment of

6  cognitive function." (*Id.*) Dr. Anderson indicated medical records

7  substantiated Paulson's "complaints of being unable to focus when

8  using extended-release morphine, but [she] does better on oxycodone

9  (the medication she's currently maintained on)." (*Id.*) She noted

10 Paul's husband claims Paulson has memory problems, and concen-

11 trating "hurts" her, but she found no substantiation in the Record

12 for his claims. Dr. Anderson opined Paulson has a medically-

13 determinable impairment of recurrent major depression (*see id.*;

14 A.R. 252), but the impairment "does not pose any severe limitation

15 of work-related mental functioning." (*Id.*) She further opined

16 Paulson has mild restriction of her activities of daily living, and

17 mild difficulties in maintaining concentration, persistence, or

18 pace, but no difficulties in maintaining social functioning, and no

19 episodes of decompensation. (A.R. 259)

20    The same day, November 20, 2008, Physical Medicine and

21 Rehabilitation specialist Mary Ann Westfall, M.D. reviewed the

22 record, and completed a Physical Residual Functional Capacity

23 Assessment form. (A.R. 263-70) She found Paulson would be able to

24 lift/carry up to twenty pounds occasionally and ten pounds

25 frequently; stand and/or walk, and sit, for about six hours each in

26 an eight-hour workday; and push/pull without limitation. In

27 reaching her opinion, Dr. Westfall noted Paulson "complained of

28 coccygeal pain for several years before she actually stopped

13 - FINDINGS & RECOMMENDATION

working (5/28/08), as shown in her medical records.  She alleges she sustained coccyx injury back in 2003 (according to her claim @ 5/25/07 exam)."  (A.R. 264)  She noted Paulson's chronic constipation could be caused by her regular use of oxycodone, and the "constipation could account for some of [Paulson's] low back complaints." (*Id.*)

Dr. Westfall indicated her residual functional capacity findings took into consideration Paulson's complaints of pain, and her mild lumbar degenerative disc disease findings.  (A.R. 265) She also took into account the claims of Paulson's husband that Paulson "spends the entire day in bed w/heating pad, secondary to the severity of her pain, [and] no longer does any of the household cleaning/cooking.  [Mr. Paulson] estimates [his wife] can only lift about 5#, stand 5 minutes, [and] has pain with reaching, walking, sitting, kneeling, or climbing stairs."  (A.R. 268)

Dr. Westfall acknowledged that Paulson's doctors' ongoing prescriptions for narcotic pain medications "lend[] some credence to her complaints, but the general lack of significant findings on objective exam (such as claim of [lower extremity] weakness not supported on 6/08 exam) counteracts this." (*Id.*)  As explanation for Paulson's ongoing coccyx pain despite a lack of objective findings, Dr. Westfall opined Paulson "may simply have a lower pain threshold than objective findings alone would support." (*Id.*)

Paulson talked with P.A. Dori Macdonald ("PA Macdonald") on December 15, 2008, regarding a complaint of insomnia.  She noted her husband snored loudly.  PA Macdonald prescribed a trial of Ambien.  Regarding her coccyx pain, Paulson stated her pain was 10/10 without medication, but on the oxycodone, it was usually a

14 - FINDINGS & RECOMMENDATION

6/10.  She was encouraged to exercise and stretch, which she was not doing.   She was taking Effexor 50 mg twice daily for depression.  Notes indicate she was "[l]aid off last May 2008," and had been unable to return to work due to her medications and her pain threshold. (A.R. 275-76)

On January 8, 2009, psychologist Megan D. Nicoloff, Psy.D. reviewed the record in connection with Paulson's request for reconsideration, for purposes of preparing a "Mental Summary." (A.R. 278)  Dr. Nicoloff affirmed the prior assessment that Paulson has no severe mental problems.  She noted Paulson has not alleged a psychological impairment, and the medical evidence suggests her depression "is primarily related to her chronic pain which she has been dealing with for several years."  (*Id.*)  Although Kaiser records show a diagnosis of major depression since 2005, the records contained "limited reference to any psych complaints and this has been treated only by [medication;] no counseling or therapy has been requested."  (*Id.*)

Also on January 8, 2009, Martin Kehrli, M.D., a Hospice Care and Palliative Medicine specialist, reviewed the record in connection with Paulson's request for reconsideration, for purposes of preparing a "Physical Summary." (A.R. 279)  He affirmed the prior finding that Paulson would be capable of doing light work.   He found Paulson's statements about her functional abilities not to be fully credible, noting Paulson claims she "is in bed 24/7," yet her doctor's notes "reflect [Paulson] spends time caring for a grandson."  (*Id.*)  Paulson claims she can only lift five pounds and only walk a few feet, "yet objective findings show she has normal strength and sensation and no significant stenosis on imaging."

15 - FINDINGS & RECOMMENDATION

1  (*Id.*)  In addition, he noted Paulson continued to work for several
2  years in spite of her pain, until May 2008.  He indicated Paulson's
3  degenerative disc disease in her lumbar spine could limit her
4  ability to lift heavy weights.  (*Id.*)

5      On March 2, 2009, PA Macdonald ordered lab tests and a routine
6  mammogram for Paulson.  Notes indicate Paulson was taking a
7  medication for constipation; morphine 15 mg/ml injectable up to
8  once a week as needed for pain; morphine 15 mg tablets, one every
9  six hours for pain; and Meloxicam, a nonsteroidal antiinflammatory
10  medication, "for arthritis."  (A.R. 302-03)

11      On March 24, 2009, PA Macdonald prescribed a TENS unit for
12  Paulson.  (A.R. 307)

13      On August 4, 2009, PA Macdonald changed Paulson's medication
14  regimen, directing her to try taking one morphine tablet every
15  eight hours for two days; then increase to 30 mg in the morning, 15
16  mg at midday, and 30 mg at night.  She also referred Paulson to a
17  pain management specialist.  Records indicate Paulson's weight at
18  this time was 194 pounds. (A.R. 311)  In addition, Paulson signed
19  an updated opiate therapy plan.  (A.R. 315-18)

20      In August 2009, Paulson completed an intake form at a pain
21  management clinic.  On the form, she indicated she experiences
22  constant pain that is burning and sharp in character.  She has
23  muscle weakness in her back, and does not exercise.  (A.R. 281)
24  She rated her pain at 8/10 to 9/10, indicating pain interferes with
25  her mood, activities, sleep, relationships, and general enjoyment
26  of life.  She indicated she obtains some relief from heat,
27  medications, and a TENS unit, as well as lying down with no
28  pressure on her back.  (A.R. 282)  Getting up and being active

16 - FINDINGS & RECOMMENDATION

makes her pain worse.  She indicated she wanted to "get medications
that will help [her] pain and any exercises that [may] help [her]
as well."  (*Id.*)  Paulson further indicated she was unable to work
due to pain, last working on May 27, 2008.  She drank four cans of
soda and smoked half a pack of cigarettes per day.  She listed her
current weight as 190 pounds.  She indicated she is depressed, has
trouble concentrating, and has trouble sleeping nearly every day,
and she sometimes had suicidal or self-harm thoughts.  (A.R. 283)
She listed her current medications as Trazodone and Fluoxetine for
depression, Topiramate for migraines, short-acting morphine and
oxycodone for pain, and diazepam for anxiety.  She indicated she
also sometimes takes over-the-counter sleep medications because her
pain is worse at night.  (A.R. 284)

On January 11, 2010, PA Macdonald completed a Physical
Capacities Evaluation form.[5]  She opined Paulson could sit, stand,
and walk, each, for about half an hour at a time; sit for no more
than one hour, and stand and walk for no more than two hours,
total, during a normal workday; lift up to ten pounds occasionally,
carry up to five pounds occasionally, and never lift or carry any
greater amounts; use her hands for simple grasping, pushing and
pulling, and fine manipulation, without limitation; use her feet to
operate foot controls "for [a] limited time"; bend occasionally;
reach above shoulder level occasionally; and never squat, crawl, or
climb.  (A.R. 371)  She opined Paulson would have no restriction of

---

[5]At the ALJ hearing, Paulson testified this form was not
completed just by reference to her medical records.  She stated
PA Macdonald checked her strength by having Paulson push against
PA Macdonald's hands with her legs and arms.  (*See* A.R. 37-38)

activities involving work at unprotected heights, and exposure to dust, fumes, and gases; and Paulson would have mild restriction of activities involving being around moving machinery, driving automotive equipment, and being exposed to marked changes in temperature and humidity. (A.R. 372) PA Macdonald stated Paulson "is functionally incapacitated due to her chronic long term pain and now weakness in her extremities that disallows repetitive work. I do not believe she is able to sustain employment." (*Id.*) She further opined Paulson would miss more than four days of work per month due to her inability to sustain activities for a full workday. (*Id.*) In a letter dated January 13, 2010, PA Macdonald further indicated Paulson "is limited in her ability for normal capacity for work due to inability to sustain either standing or sitting for a length of time. She is limited to working with machinery due to the daily narcotic medications she uses to control her pain. Subsequent to the restriction of her activity and chronic pain for the last 8 years, I believe that she is unable to be employed." (A.R. 374)

On February 16, 2010, Paulson called to request a refill of her morphine, stating she had been out of the medication for two weeks "due to Husband's decrease in pay (had to wait until this pay day to request refill)." (A.R. 423) She was scheduled for a telephone appointment with James Mark Bertola, M.D., an anesthesiologist and pain management specialist. The doctor wanted Paulson to get a new urine drug screen prior to authorizing any refill of the morphine, and he wanted her to discontinue use of the oxycodone. Paulson "became very upset and confrontational as [they] talked about the reasons behind" the doctor's recommenda-

18 - FINDINGS & RECOMMENDATION

1  tions.  (A.R. 422)  The doctor offered to refer her to a colleague
2  for a second opinion.  He transferred Paulson to the scheduler, but
3  Paulson declined an appointment, noting she was working with
4  PA Macdonald, and was starting physical therapy.  (A.R. 422)

5      Later the same day (February 16, 2010), Paulson attempted to
6  reach PA Macdonald by phone.  Paulson was crying and said she was
7  feeling suicidal.  The emergency service was able to reach
8  PA Macdonald, who attempted to call Paulson, but a "crying young
9  girl answered the phone - stated that [Paulson] had taken a lot of
10  her pills and was being taken to [the hospital] by ambulance."
11  (A.R. 419, 420)  Paulson was seen in the ER "for evaluation of
12  depression and overdose."  (A.R. 433)  Notes indicate she had been
13  on a combination of oxycodone and oral morphine for quite some
14  time, and had run out of her morphine two weeks earlier.  When she
15  called the pain clinic for a refill, she was unable to reach her
16  primary care doctor, and Paulson stated the doctor she spoke with
17  "was very rude and refused [to] refill her pain medicine."  (*Id.*)
18  Paulson called "911" and asked them to talk with her doctor.  When
19  she was told they could not do this, she took "a handful of
20  oxycodone."  (*Id.*)  She was brought in by police, and was on a
21  police hold.  On arrival at the ER, Paulson was "upset, crying,
22  tearful, saying that she is very depressed and wants to die and
23  relates it entirely to this interaction today with this other
24  physician."  (*Id.*)  Notes indicate Paulson was "[n]ot a smoker."
25  (*Id.*)  Doctors believed Paulson's ongoing risk for self-harm was
26  "quite high, based on her statements and her actions."  (A.R. 434)
27  Paulson continued to state she wanted to die, and wanted to return
28

19 - FINDINGS & RECOMMENDATION

home and finish the job.    She agreed to be admitted to the psychiatric unit for evaluation.  (A.R. 434-35)

The next day, Paulson tried to reach PA Macdonald from the hospital, again requesting a refill of her morphine and a prescription for Valium.  Paulson stated she had not slept in two days, and she needed her medication and wanted to go home.  Paulson talked with a nurse at PA Macdonald's office, who advised her to work with the hospital staff "to help her stay safe," and Paulson agreed to do so.  (A.R. 416)  Paulson was evaluated by a psychiatrist, who determined she was no longer at risk of harming herself, and she was "discharged to the care of her family."  (A.R. 431) She agreed to contact her doctor to discuss some counseling.  Her discharge diagnosis was depressive disorder, not otherwise specified; rule out substance or opiate abuse; rule out substance-induced depressive disorder.  (*Id.*)

On February 22, 2010, PA Macdonald called Paulson, noting she had not had a post-hospitalization followup yet.  Paulson stated she was taking four tablets of oxycodone every four hours, together with Ibuprofen, and she was "not sleeping at all," because whenever she turned over, she had too much pain to sleep.  (A.R. 412) PA Macdonald stated it would not be advisable for Paulson to go back to using morphine because "it did not seem to help much and made her thinking less clear." (A.R. 413)  She directed Paulson to continue taking oxycodone 20 mg every four hours, and she added Remeron for the nighttime.  (*Id.*)

Paulson was scheduled for a psychiatric followup on February 25, 2010.  However, on March 1, 2010, Paulson sent PA Macdonald the following e-mail:

20 - FINDINGS & RECOMMENDATION

> Dear doctor Dori: I have tried the Remeron
> that you prescribed for me, however I have
> even tried taking 2 at night time and it is
> not helping me at all.  Please is there
> something else we can try?  Also, I am having
> severe muscle spasms and I am wondering if you
> could please prescribe me something for it?
> We just got our 2nd vehicle running again so I
> will call and make an appoint[ment] with [the
> psychiatrist] tomorrow, I have not seen her as
> of yet.  I am doing ok and hanging in there
> but I am in such pain with just using the
> Oxycodone.  Please let me know about the 2
> medicines above so that I can come in and pick
> them up as soon as you prescribe me something.

(A.R. 410)  On March 3, 2010, PA Macdonald responded, advising Paulson to continue taking two Remeron at night, noting it would take some time for the medication to become effective, and Paulson should "hang in there for a month - using it every night."  (*Id.*)

On March 4, 2010, Paulson failed to show up for her psychiatry intake appointment.  Paulson called the clinic on March 5, 2010, to report that she had missed the appointment "due to being in too much pain."  (A.R. 407)  On March 8, 2010, PA Macdonald sent Paulson an e-mail, encouraging her to "Hang in there with the two Remeron," and stating, "I expect that you will reschedule your Mental Health Appointment soon - You need to get some perspective as to how depression is NOT helping your []physical health." (A.R. 411)  The appointment was rescheduled for March 17, 2010. (A.R. 407)

On March 12, 2010, Paulson received a narcotic injection to treat her complaint of severe left shoulder and upper back pain. (A.R. 400-01)  Paulson saw PA Macdonald again on March 14, 2010, complaining of pain in her left shoulder.  Paulson stated it felt like she had "a pinched nerve - intense pain," and she could barely move it at all without pain.  (A.R. 402)  She was tender to

21 - FINDINGS & RECOMMENDATION

1   palpation over the shoulder, and muscle spasms were observed.  She
2   was given a "rescue" treatment and was put back on Morphine, with
3   a plan to reduce her oxycodone dosage.  PA Macdonald noted that if
4   Paulson did not attend her mental health appointment, she would be
5   titrated off her pain medications.  (A.R. 403)

6       On  March  17,  2010,  Paulson  saw  Melinda  J.  Sherman,  a
7   Psychiatric  Mental  Health  Nurse  Practitioner,  for  an  intake
8   appointment and mental status evaluation.  (A.R. 395-99)  Paulson's
9   diagnoses were listed as "Chronic nonmalignant pain," and "Mood
10  disorder  .  .  .  due  to  chronic  pain;  reduce[d]  functioning  and
11  quality of life."  (A.R. 395)  Paulson stated her chief complaint
12  as follows: "I need my providers to give me definate [sic] answers
13  to what is wrong with me.  I don't need to be talked down to or
14  lectured by my providers when I am trying my best." (*Id.*)  Paulson
15  stated she had no mental health issues "prior to experiencing and
16  having to learn to live with chronic pain." (*Id.*)  She stated pain
17  severely impacted her functional abilities and quality of life.
18  She stated she used to enjoy working, and she used to enjoy deep
19  sea fishing and other outdoor activities, but she was no longer
20  able to do any of these things due to pain.  She indicated her days
21  now were spent "chasing her pain and dreading nights." (A.R. 395-
22  96)  She  would  begin  developing  anxiety  in  the  afternoon  in
23  anticipation of "having another night of toughing it out."  (A.R.
24  396)  She  described  herself  as  "very  sleep  deprived,"  noting
25  shoulder pain would awaken her whenever she moved in bed.  (*Id.*)

26      Paulson stated her suicide attempt was precipitated by the way
27  she was treated when she tried to reach the pain clinic for a
28  refill of her morphine.  "She reports that she did not know that it

22 - FINDINGS & RECOMMENDATION

was a narcotic and that she could not stop it abruptly.  She . . .
could not afford the refill any sooner and that is why she waited
so long." (*Id.*)  She reported current primary stressors including
chronic pain, not knowing definitively what was wrong with her, and
financial strain due to not working for two years and supporting
her daughter and grandson.  (*Id.*)  She also was concerned about
newly-developing pain in her opposite shoulder.  (A.R. 398)
NP Sherman considered Paulson to be a low risk for suicide or self
harm.  (A.R. 397)  She started Paulson on a trial of Effexor for
depression, and a trial of Temazepam for insomnia, discontinuing
the Remeron and Prozac.  (A.R. 398-99)

Paulson saw PA Macdonald again on March 18, 2010.  Paulson's
diagnoses at this visit were noted as insomnia, and arthralgia of
right shoulder.  She stated her pain was "ever so slightly im-
proved" since restarting the morphine.  She also felt better after
only one day of the Effexor.  PA Macdonald recommended physical
therapy for Paulson's shoulder pain, but Paulson stated she could
not afford the treatments, which were $125 each, so she declined
the referral.  (A.R. 393-94)  PA Macdonald recommended Paulson
learn an exercise program to improve her pain.  She noted this
would be a slow process, "like crawling slowly out of a 'big
hole.'" (*Id.*)

On March 25, 2010, Paulson stated she still was not sleeping
at night due to muscle spasms.  Regarding her chronic coccyx pain,
she stated it was "barely managed at all."  (A.R. 408)
PA Macdonald indicated she had hoped Paulson's pain could be
managed solely with oral oxycodone, but Paulson now was indicating
she thought maybe the morphine did help, after all.

23 - FINDINGS & RECOMMENDATION

1    Paulson spoke by telephone with NP Sherman on April 13, 2010,
2  for followup.  Paulson stated she was sleeping better with the
3  Temazepam.  She also had restarted the Remeron, taking both
4  medications on an empty stomach before going to bed.  She stated
5  that on this regimen, she was sleeping through the night most of
6  the time.  Her physical symptoms were also somewhat improved on her
7  new medications, and she was using less morphine as a result.  She
8  reported still being depressed, spending a lot of time in her room,
9  ruminating "about her financial stress and her daughter living with
10 them."  (A.R. 391)  She was directed to follow up in four to six
11 weeks, calling as needed in the meantime.  (*Id.*)

12    A Kaiser pharmacist entered a progress note regarding Paulson
13 on May 3, 2010, apparently in connection with Paulson's request for
14 a medication refill.  The note states: "No.  Medication was discon-
15 tinued after her visit to pain clinic (which today in the office
16 she denied that she saw them).  WILL NOT RESTART BENZODIAZEPINES."
17 (A.R. 390)  Her refill request for diazepam also was declined, with
18 a note stating: "If member is to restart this medication, please
19 update order."  (*Id.*)

20    On May 4, 2010, Paulson called the clinic complaining of acute
21 neck pain, radiating into her left arm, unrelieved by her
22 prescribed morphine, Soma, and Ibuprofen.  She was scheduled for an
23 appointment with a doctor the next day.  (A.R. 387-88)  On May 5,
24 2010, Paulson saw family practitioner Ritu Manocha, M.D.,
25 transferring care from PA Macdonald.  Her weight was 197 pounds at
26 this time.  Paulson complained of "excruciating neck [and] shoulder
27 [pain] radiating to Left arm."  (A.R. 383)  "Holding her arm, and
28 started to cry, states she gets this flare up and usually gets the

24 - FINDINGS & RECOMMENDATION

1   injection in the clinic which helps.  She is already on Morphine
2   among others." (*Id.*)  Paulson had not started physical therapy as
3   recommended by PA Macdonald.  Paulson claimed she had not taken any
4   morphine that day, and she rated her pain at 10/10.  On examina-
5   tion, the doctor noted "[m]inimal tenderness, focal tender point
6   over mid scapula edge on left without swelling or redness," and
7   normal shoulder range of motion.  (*Id.*)  The doctor gave Paulson a
8   Toradol injection, and told Paulson she needed to start physical
9   therapy.  He noted a urinary drug screen should be considered ("has
10  been ordered but not done"), and possible referral to a pain
11  management specialist.  (A.R. 384)  He directed Paulson to follow
12  up when she was one to two weeks into her physical therapy.
13  (A.R. 384)  About three hours later, Paulson reported continuing
14  shoulder pain.  She stated that although she normally got relief
15  from a Toradol injection, this time the injection had not helped
16  her pain.  She was given a second Toradol injection.  (A.R. 380)

17      On May 6, 2010, Paulson had x-rays of her cervical spine in
18  connection with her complaints of neck and shoulder pain.  The x-
19  rays showed minimal degenerative disk disease and narrowing in
20  Paulson's cervical spine, but "[n]othing acute." (A.R. 428)  She
21  was directed to increase her Remeron and take Soma, both at night.

22      Paulson saw a physical therapist on May 12, 2010, for a
23  cervical spine evaluation.  (A.R. 376-79)  Paulson described her
24  daily activities as follows: "I do nothing.  I lay in bed all the
25  time, as soon as I move the tailbone pain is worse." (A.R. 376)
26  She was on medication for her chronic tailbone pain.  The reason
27  for her physical therapy referral was sharp pain in her left
28  shoulder, referring up to her neck and down the back of her arm to

25 - FINDINGS & RECOMMENDATION

the elbow.  She also complained of tingling and numbness from the front of her shoulder down to her forearm, left thumb, and pointer finger.  (*Id.*)  Her pain was aggravated by lying on her left side, and cervical rotation.  She obtained some relief from injections, ice, and lying propped up in bed with ice and a neck pillow.  (*Id.*)

On examination, Paulson had some increased pain from forward flexion, but the pain decreased in less than one minute.  She had 100% extension of her neck; 30 degrees on side-bending bilaterally; 70 degrees of rotation on the right; and 50 degrees of rotation of her posterior arm on the left.  She had full ranges of motion of her left shoulder, with no increase in symptoms; however, with her hands behind her head, she experienced "severe pain" in her left tricep, "not recreated with cervical protraction alone."  (A.R. 377)  She was treated with manual therapy and traction, which decreased her pain.  Paulson was noted to be "very deconditioned as she lays in bed due to her pain and she has very poor posture both of which are likely contributing to [her] pain."  (A.R. 378)  The therapist noted Paulson would benefit from further physical therapy, but Paulson declined "due to finances."  (*Id.*)  She was instructed in "proper self care, posture, positioning (ie position-ing in bed), . . . anatomy and importance of posture/position of head."  (*Id.*)  She also was instructed in a home exercise program, including how her husband could apply gentle traction for pain relief.  Paulson also was advised of the importance of regular activity, and how staying in bed all day "only increases her pain, [and] makes her weaker and tighter."  (*Id.*)

On June 10, 2010, Paulson was seen for a "plugged ear."  (A.R. 442)  Dr. Manocha prescribed pseudoephedrine.  (A.R. 443)  He also

26 - FINDINGS & RECOMMENDATION

wrote another referral to physical therapy, as well as a referral
to Kaiser's pain management department "for Pain Group Classes."
(A.R. 442)  He also directed Paulson to have a urine drug screen
that day.  (*Id.*)

On August 2, 2010, Paulson saw Internal Medicine specialist
Cheryl Layne, M.D., apparently for purposes of completing a new
Complex Opioid Therapy Plan.  (A.R. 460)  Although Paulson
initialed the form in several places, the form is not signed at the
end.  (A.R. 463-66)  On August 20, 2010, Dr. Layne signed a
Certificate of Disability form in connection with Paulson's
application for a Disabled Person Parking Permit.  (A.R. 454-55)

Paulson received an epidural steroid injection from pain
management specialist Suzanne C. Zarling, M.D. on August 13, 2010.
Paulson also received a prescription for Lidocaine patches.  (A.R.
456-58)


## B.  Vocational Expert's Testimony

At the VE's request, because the record does not contain a
work history report, Paulson testified in some detail about her
past work.  (*See* A.R. 62-63)  In 2000, she worked as a customer
service account manager for an Internet Service Provider.  Her
duties included accepting payments from customers, helping
customers "troubleshoot if they were having problems," and
transferring them to a technical specialist if necessary.  (A.R.
63-65)  She had to learn a great deal about how the internet
service worked, and stated, "That's why it's so hard to be in the
position I am now, is because I was such a go-getter and you know,
I have had thoughts of suicide, you know, because of being such a

27 - FINDINGS & RECOMMENDATION

1  go-getter and working so many years." (A.R. 65)  The VE indicated
2  the clerical part of this job "is probably best described as a
3  cashier one."  (A.R. 67)  He stated this is a sedentary, skilled
4  job at the SVP-5 level.[6]  (*Id.*)  The VE further stated "there's a
5  title called user support analyst, which it's an SVP-7 and
6  sedentary[.] [S]he probably didn't work at the SVP-7 level but her
7  testimony is she did learn most of the things that were needed at
8  the time.  That's a job, obviously, that changes rapidly so any
9  skill she learned five, six, 10 years ago would not be real
10 applicable today."  (*Id.*)

11     Paulson also worked for a printing company, taking orders for
12 classified ads in the newspaper, typing while she talked on the
13 phone.  (A.R. 65-66)  The VE identified this job as an "advertising
14 clerk, SVP-4 and sedentary."  (A.R. 67)

15     Paulson worked in retail sales for J.C. Penney, which required
16 her to be on her feet all day.  (A.R. 66)  The VE identified this
17 job as "retail sales clerk, SVP-3 and light."  (A.R. 67)

18     She also worked at a customer service job on the phone,
19 calling publishers "to see what books were published, because
20 libraries and universities all over the world would want to know if

21

22     [6]The "SVP" refers to the level of "specific vocational prepa-
23 ration" required to perform certain jobs, according to the
   *Dictionary of Occupational Titles*.  The SVP "is defined as the
24 amount of lapsed time required by a typical worker to learn the
   techniques, acquire the information, and develop the facility
25 needed for average performance in a specific job-worker situation."
   *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or.
26 Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies
   jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of
27 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as
   skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or
28 Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

28 - FINDINGS & RECOMMENDATION

1 those books were published yet so that they could order from the

2 publisher." (A.R. 66-67)  The VE identified this job as "customer-

3 service clerk SVP-4 and light although it's done posturally in a

4 sedentary position in most environments."  (A.R. 67-68)

5     In her most recent job, Paulson worked as a receptionist at LG

6 International.  Her duties included answering the phone, helping

7 make labels and buttons in the shop, and sometimes lifting heavy

8 boxes.  She was laid off in May 2008, but stated she would not have

9 been able to continue working even if she had not been laid off.

10 She stated had been missing a lot of work prior to the layoff.

11 (A.R. 40-42)  The VE described this job as follows:

12         That's an SVP-4 and sedentary.  To the extent
        that she did production assembly, that's

13         unskilled and light.  And she described moving
        boxes in a warehouse kind of environment.

14         That would be a material handler, SVP-3 and
        the DOT calls it heavy because again, it's an

15         omnibus title and covers everything.  She
        probably was not working at a heavy level,

16         would be possibly medium.

17 (A.R. 68)

18     The ALJ asked the VE the following question:

19         If we had an individual with age, education,
        and work experience similar to that of the

20         claimant who is capable of lifting 10 pounds
        occasionally, less than 10 pounds frequently,

21         was limited to occasional overhead reaching
        with the right arm, restricted to simple

22         routine work and needs to be able to sit or
        stand in the performance of the work – so the

23         simple routine work would rule out at least
        the ones with SVP-4 and above, certainly – and

24         the sales clerk was a light job, so it rules
        that out, and the material handler was a

25         heavy- or medium-as-performed job, and so
        that's ruled out.  So I don't see any past

26         relevant work that can be done within this
        RFC, do you?

27

28 (A.R. 69)

29 - FINDINGS & RECOMMENDATION

1    The VE agreed that a person with those limitations could not

2 do any of Paulson's past relevant work. (*Id.*)   The VE indicated

3 the hypothetical individual could perform some jobs in the national

4 economy, but "[n]ot very many." (*Id.*)   The VE indicated "[t]here

5 would be a few sit-stand jobs that would be predominantly in the

6 cashiering field, but certainly not the whole range of cashiers.

7 Some assembly jobs, some hand-packaging jobs, but their numbers are

8 not very large." (*Id.*)   The VE estimated there would be no more

9 than 3,000 Cashier II category jobs in Oregon; no more than 7,000

10 in Washington; and no more than 300,000 nationally.   Cashier II

11 jobs normally have a sit-stand option, and they are defined as

12 light in the *DOT*.  (A.R. 70)

13    As to small product assembly jobs at the sedentary level, with

14 a sit-stand option, the VE estimated there would be about 1,200 in

15 Washington, and perhaps 100,000 nationally.  (*Id.*)

16    Regarding the hand packaging jobs, he estimated there would be

17 no more than 90,000 nationally, and no more than 1,000 in

18 Washington.  (A.R. 70)   He explained that the sedentary hand

19 packaging jobs "are primarily in produce packing, candy packaging,

20 nuts packaging, small items like that." (A.R. 71-72)

21    The VE stated if the individual required breaks beyond those

22 normally available ("a morning break, an afternoon break, and a 30-

23 minute to an hour lunch break"), for purposes of lying down for

24 thirty minutes, there would not be any jobs available for the

25 individual.  (A.R. 70-71)  Similarly, if an individual had to miss

26 more than four days of work per month, the individual likely would

27 be unable to sustain competitive employment.  (A.R. 72-73)   In

28 addition, in "a vast majority" of cases, an individual probably

30 - FINDINGS & RECOMMENDATION

1   could not sustain employment in a job with production quotas, if
2   the individual could only be 60 to 70 percent as productive as
3   other average workers due to medication side effects and/or
4   impairments, whether physical or mental.  (A.R. 73)

5

6                    **C.  *Paulson's Hearing Testimony***

7        Paulson stated she is "in bed all day long."  (A.R. 43)  She
8   lives with her husband, 24-year-old daughter, and 5-year-old
9   grandson.  Her daughter stays home and takes care of Paulson.
10  (A.R. 43-44)

11       Paulson stated she has had pain for about eight years, with
12  the pain getting worse during that time.  She does not believe she
13  can work, even with a sit-stand option, no substantial lifting, and
14  fairly simple and routine tasks.  She stated:

15              As I've even tried to cook dinner, I can't
                handle even making a dinner, so I know even at
16              home I can't withstand standing for a very
                long time, or sitting for a very long time.
17              And as my doctor has explained to me, once I
                stand up and I get my legs in motion, that's
18              what starts my tailbone and that inflammation
                to start working up again, and starts the
19              process of getting it inflamed again and
                continuing the inflammation to get stronger.
20              So all I can say is that all I can do is lay.
                That's the only time I'm comfortable is when I
21              can lay in bed.  And even then I'm in pain,
                when I'm laying down.
22

23  (A.R. 44)  She estimated she can sit and stand, each, for no more
24  than ten to fifteen minutes before she becomes uncomfortable and
25  needs to change position.  (A.R. 46-47)  She stated she can only
26  walk about "20 steps" before she needs to rest.  Noting Paulson had
27  not used a wheelchair to get to the hearing, the ALJ asked if she
28  had to "stop and rest every 20 feet[.]"  Paulson replied, "No, I

31 - FINDINGS & RECOMMENDATION

1 didn't. I made myself." (A.R. 47-48)  She has difficulty lifting,
2 and cannot lift a gallon of milk.  (A.R. 48)

3      Paulson stated she takes morphine and Oxycontin on a regular
4 basis.  The ALJ observed that Paulson appeared "very coherent and
5 wide awake for having been up taking those medicines."  (A.R. 45)
6 Paulson stated she suffers side effects from the medications
7 including "a lot of depression," and problems with memory and
8 concentration.  (A.R. 46)  She stated her pain is constant.  When
9 she is on her medications, the pain normally is about a 5 on a 10-
10 point scale.  If she forgets to take a dose, the pain goes "right
11 back up to an eight."  (*Id.*)

12      Paulson indicated she has a migraine headache about once a
13 month, on average.  The headaches average about four hours in
14 duration, during which she has to lie down.  During a migraine
15 headache, her pain level is at 10/10.  She will be "throwing up and
16 stuff," and have visual problems ("the aura").  (A.R. 49)  She
17 sometimes can tell when a migraine is coming on, and she will take
18 medication that shortens the duration of the headache. (*Id.*)

19      Paulson also has pain in her shoulders, primarily her right
20 shoulder and right side of her neck.  She has pain when she moves
21 the shoulder, and is limited in how high she can lift her arm.  She
22 can reach upward, but cannot extend her arm all the way.  She can
23 reach out in front of her and to the side, but cannot reach back
24 behind her with her right arm.  (A.R. 50-51)  On an average day,
25 her shoulder pain is at a level of about 5/10.  She has a TENS
26 machine that helps somewhat, and she uses it at least twice a day.
27 (A.R. 52-53)  The shoulder pain interferes with her sleep because
28 when she rolls over, "it turns into shooting pains and then it's

32 - FINDINGS & RECOMMENDATION

just that excruciating, sharp pain," waking her up. (A.R. 53)  She
stated she is awakened by pain "at least four times during the
night." (*Id.*)  She usually gets about five hours of sleep during
the night, and she also takes two naps during the day, one from
about 9:00 to 10:30 in the morning, and the other from about 2:00
to 3:30 in the afternoon.  (A.R. 53-54)

Regarding her depression, Paulson acknowledged that her
doctors have recommended she see a counselor, "but the problem is
money." (A.R. 54)  She stated, "We can only do so much with living
off my husband's income." (*Id.*)

Paulson stated her husband and daughter do the household
chores.  Up until about three months prior to the ALJ hearing,
Paulson had been able to help with making her bed, and doing
minimal grocery shopping, but she stated that within the preceding
two or three months, her "back and everything's gotten really bad."
(A.R. 55)  Even before that time, however, she could only go to the
grocery store for about thirty minutes, and making the bed was
painful for her.  (*Id.*)

### D.  Third-Party Testimony

Paulson's husband Charles testified briefly at the ALJ
hearing.  He stated he and his wife have been married for twenty-
six years.  He works full time, and on an average day, he spends
from 4:00 p.m. to 7:00 a.m. at home with his wife.  (A.R. 57-58)
He has observed that Paulson struggles with memory and concentra-
tion.  He stated, "She gets confused.  Different things that we've
discussed, and during the course of a week, planning for bills,
things that we just discussed financially, and also that she just

33 - FINDINGS & RECOMMENDATION

1 can't remember just in a short period of time what we've discussed.
2 She blanks totally out." (A.R. 58) In his opinion, it is "mainly
3 short-term" memory that causes Paulson problems. (*Id.*) He had
4 noticed the problem worsening over the previous couple of years.
5 He stated when he and Paulson are having a short conversation, "she
6 will pause in it, and it's like her mind wanders off and she's just
7 not concentrating." (A.R. 59) However, if she gets involved in a
8 television show, she is able to track along with it for half an
9 hour. (*Id.*)

10     According to Charles, before Paulson got laid off from work,
11 she was "doing a good job, but she had to start taking the heating
12 pad to work, sitting on that on a daily basis. Her back started to
13 get really sore, and she was unable to sit for a long period of
14 time." (A.R. 59) He agreed with Paulson's statement that her pain
15 had gotten worse over the previous two or three months, and she was
16 no longer able to help with any of the housework. (A.R. 59-60)

17     Charles stated his wife hates having to lie around all the
18 time. He stated she used to be "outgoing and just enjoyed life."
19 (A.R. 61) He indicated he and his wife would like to know what is
20 wrong with her, stating she has seen specialists, and they are
21 doing everything they can to find the cause of her pain. (A.R. 60,
22 61)

23     Charles also completed a written third-party Function Report.
24 (A.R. 172-79) He indicated Paulson stays in bed all day until he
25 gets home from work. Paulson used to be able to work at a job, do
26 housework, and enjoy golf, fishing, camping, and shopping, but she
27 is no longer able to do these things. He indicated pain keeps
28 Paulson awake at night. She has no problems with her personal

34 - FINDINGS & RECOMMENDATION

care, but is unable to do household chores or yard work. (A.R. 172-74)  He stated, "She is in severe pain always she has to be on her heating pad in bed to find relief and lots of medicine." (A.R. 175)  Charles stated his wife goes out about once every two weeks.  She sometimes drives, but "sometimes she can't go alone because of all of the medication she is on," so he will drive. (*Id.*)  She might go grocery shopping with Charles a couple of times a month, but she shops for clothing and medicines by phone and computer.  (*Id.*)  According to Charles, he and his wife used to be very sociable and "on the go always."  (A.R. 176)  Now they go to bed at 9:00 p.m.  He indicated they go to a restaurant maybe once every six months.  (*Id.*)

Charles listed his estimates of Paulson's functional abilities.  He estimated she can lift "maybe 5 lbs"; she cannot bend as far or long as she used to; she can stand for five minutes; "reaching hurts, walking hurts, sitting hurts, kneeling hurts, stair climbing - hurts, memory - forgets often, complete tasks - starts something [and] can't finish, concentration - hurts." (A.R. 177)  According to him, Paulson can only walk "a few feet" before having to stop and rest for "at least a while."  (*Id.*)  He indicated Paulson has a hard time getting comfortable, and "she is always crying a lot [and] wondering why this has happened to her so young[.]"  (A.R. 178)

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula-tions?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

/ / /

36 - FINDINGS & RECOMMENDATION

1    The Commissioner bears the burden of proof at step five of the
2  process, where the Commissioner must show the claimant can perform
3  other work that exists in significant numbers in the national
4  economy, "taking into consideration the claimant's residual
5  functional capacity, age, education, and work experience." *Tackett*
6  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
7  fails meet this burden, then the claimant is disabled, but if the
8  Commissioner proves the claimant is able to perform other work
9  which exists in the national economy, then the claimant is not
10  disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
11  §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

12    The ALJ determines the credibility of the medical testimony
13  and also resolves any conflicts in the evidence.  *Batson v. Comm'r*
14  *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
15  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
16  Ordinarily, the ALJ must give greater weight to the opinions of
17  treating physicians, but the ALJ may disregard treating physicians'
18  opinions where they are "conclusory, brief, and unsupported by the
19  record as a whole, . . . or by objective medical findings."  *Id.*
20  (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
21  (9th Cir. 2001)).  If the ALJ disregards a treating physician's
22  opinions, "'the ALJ must give specific, legitimate reasons'" for
23  doing so.  *Id.* (quoting *Matney*).

24    The law regarding the weight to be given to the opinions of
25  treating physicians is well established.  "The opinions of treating
26  physicians are given greater weight than those of examining but
27  non-treating physicians or physicians who only review the record."
28  *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.

1  2003).    The *Benton* court quoted with approval from *Lester v.*

2  *Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as

3  follows:

> As a general rule, more weight
> should be given to the opinion of a
> treating source than to the opinion
> of doctors who do not treat the
> claimant.    At least where the
> treating doctor's opinion is not
> contradicted by another doctor, it
> may be rejected only for "clear and
> convincing" reasons.    We have also
> held that "clear and convincing"
> reasons are required to reject the
> treating doctor's ultimate conclu-
> sions.    Even if the treating
> doctor's opinion is contradicted by
> another doctor, the Commissioner may
> not reject this opinion without
> providing "specific and legitimate
> reasons" supported by substantial
> evidence in the record for so doing.

14  *Id.* (quoting *Lester, supra*).

15  The ALJ also determines the credibility of the claimant's

16  testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's
> subjective symptom testimony, the ALJ must
> engage in a two-step analysis.    *Smolen v.*
> *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82.    If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so."    *Id.* at 1284.

26  *Batson*, 359 F.3d at 1196.

27  / / /

28  / / /

38 - FINDINGS & RECOMMENDATION

1        **B.   The ALJ's Decision**

2        The ALJ found Paulson was insured for purposes of a Title II

3   claim through December 31, 2012.  She therefore "must establish

4   disability on or before that date in order to be entitled to a

5   period of disability and disability insurance benefits." (A.R. 18)

6   He found Paulson has not engaged in substantial gainful activity

7   since her alleged onset date of May 28, 2008.  (A.R. 20)

8        The ALJ found Paulson has severe impairments consisting of

9   "obesity, chronic severe constipation, chronic narcotic use,

10  degenerative disc disease of the lumbar spine, depression, chronic

11  pain, and migraine headaches." (*Id.*)  However, he further found

12  that none of these, singly or in combination, meets or medically

13  equals any of the impairments listed in the regulations.  (*Id.*)

14  Specifically with regard to Paulson's degenerative disc disease of

15  the cervical spine, the ALJ noted the Record contains "no evidence

16  of nerve root compression characterized by neuro-anatomic distri-

17  bution of pain, limitation of motion of the spine, [or] motor loss

18  (atrophy with associated muscle weakness or muscle weakness)

19  accompanied by sensory or reflect loss[,]" and the impairment

20  therefore does not meet Listing 1.04. (A.R. 21)  He further noted,

21  "As there are no Listings for obesity or chronic pain, these

22  impairments have been factored into the assessment of [Paulson's]

23  other impairments and their relationships to the requirements of

24  the Listings." (*Id.*)  He found Paulson's "headaches do not meet or

25  equal the Listings at 12.02 and 12.03 and [her] chronic constipa-

26  tion does not meet or equal any Listing found at 5.00." (*Id.*)

27       The ALJ further found that none of the other conditions for

28  which Paulson has been treated, or of which she has complained, are

39 - FINDINGS & RECOMMENDATION

1 severe, including nicotine dependence, aortic valve regurgitation,
2 ovarian cysts, insomnia, right arm and shoulder pain, and neck
3 pain.  He found "these alleged impairments, considered singly or
4 together, have caused only transient and mild symptoms and
5 limitations, are well controlled with treatment, or are otherwise
6 not adequately supported by the medical evidence in the record."
7 (*Id.*)

8    Regarding Paulson's mental impairments, the ALJ found her
9 "depression and her chronic pain medication use do not meet or
10 medically equal the criteria of Listings 12.04 or 12.09."  (*Id.*)
11 He found Paulson has mild restriction in her activities of daily
12 living and social functioning; moderate difficulties with regard to
13 concentration, persistence, or pace; and no episodes of decom-
14 pensation of extended duration.  (*Id.*)

15    The ALJ found Paulson has the residual functional capacity
16 ("RFC") to perform sedentary work, with limitations of lifting up
17 to ten pounds occasionally and less than ten pounds frequently;
18 only occasional overhead reaching with her right arm; the ability
19 to sit or stand as needed while she is working; and restriction to
20 simple, routine work. (A.R. 22)  In reaching this conclusion, the
21 ALJ found Paulson's allegations regarding the intensity,
22 persistence, and limiting effects of her symptoms are not fully
23 credible, to the extent they are inconsistent with the above RFC.
24 (*Id.*)

25    In support of his credibility finding, the ALJ noted the
26 record evidence indicates Paulson's "symptoms have not worsened
27 since 2006, and . . . she was able to work up until May 2008 in
28 spite of her symptoms." (A.R. 23)  The ALJ noted Paulson's medical

40 - FINDINGS & RECOMMENDATION

records indicate her "symptoms are grossly disproportionate to the objective and clinical findings." (*Id.*)    He noted Paulson complains of severe sacral and coccyx pain, but MRIs of those areas show no abnormality that would account for her pain. X-rays in May 2008 of her lumbar spine were normal, and a July 2008 bone scan also showed no abnormalities. Although an MRI in August 2008, showed some "mild multilevel degenerative changes within the lumbar spine," there was "no advanced stenoses or definite neural impingement." (A.R. 24)

Regarding Paulson's "depression, and complaints of fatigue, memory and concentration problems," the ALJ noted Paulson has never "received or sought mental health counseling, nor does the record show [she] has ever been referred for mental health counseling by any of her medical providers."[7] (*Id.*)

The ALJ "assigned some weight" to the testimony of Paulson's husband, noting "[h]is statements are considered credible to the extent that he has accurately reported what he has seen, what has been exhibited to him, and what he has been told." (A.R. 24) However, the ALJ further noted that although Mr. Paulson's testimony was "credible, behavior exhibited or symptoms reported by a subject are not an adequate basis to establish disability." (*Id.*) The ALJ found more persuasive "the opinions from medical

---

[7]As noted above in the medical summary, Paulson's doctors recommended counseling after her suicide attempt which post-dated the ALJ's decision.    The Appeals Council considered Paulson's medical records post-dating the ALJ hearing, which included the records from, and subsequent to, her suicide attempt, but "found that this information does not provide a basis for changing the [ALJ's] decision." (A.R. 1-2, 4)

professionals who are trained to evaluate impairments and their impact on functional capacity." (A.R. 24-25)

The ALJ gave "some weight" to the opinions of the consulting physicians, Drs. Anderson and Nicoloff, who opined Paulson's depression was related to her chronic pain, and had not prevented her from working in the past. However, the ALJ found Paulson's "depression, in addition to the side effects from her heavy medications, limit her to simple, routine work." (A.R. 25) Regarding Paulson's physical functional abilities, the ALJ gave "great weight" to the opinions of consulting doctors Westfall and Kehrli, who opined Paulson would be able to perform light work. However, the ALJ gave Paulson "the full benefit of the doubt regarding her allegations of lower back and upper extremity pain," and therefore limited Paulson "to sedentary exertion activities." (*Id.*)

The ALJ gave PA Macdonald's opinion regarding Paulson's functional abilities "a small amount of weight." (A.R. 26) He noted PA Macdonald acknowledged that "she is not trained to complete the 'tests of functional capacity.'" (*Id.*) He further found the objective evidence of record "does not show that [Paulson's] pain has resulted in any muscle weakness, as Ms. Macdonald reports," and "treatment records simply do not reveal the type of significant clinical and laboratory findings that one would expect to find to support a finding of total disability." (*Id.*)

The ALJ noted Paulson's medical records, which begin about two years before her alleged onset date, show her symptoms of pain and depression have not worsened progressively over the years, and she

1  continued to work in spite of her symptoms.  Paulson has been on
2  "heavy narcotic pain medications at least since 2006." (*Id.*)
3  Paulson consistently rated her pain at 8/10 to her treating
4  sources, yet "this pain level did not preclude her from working in
5  the past," or from caring for her grandson. (*Id.*)  The ALJ
6  acknowledged that Paulson's husband testified Paulson was per-
7  forming well at work, although by the time the job ended, she was
8  taking a heating pad to sit on to relieve discomfort due to
9  sitting.  However, the ALJ further noted Paulson's last job did not
10 end due to her medical conditions, but due to a layoff. (*Id.*)

11    The ALJ noted Paulson has received generally conservative
12 treatment for her pain and depression.  Even though the ALJ did not
13 find objective evidence in the record to explain Paulson's right
14 arm and shoulder pain, he nevertheless "accord[ed] her the full
15 benefit of the doubt," and reduced her RFC accordingly. (A.R. 27)

16    Based on his RFC finding, the ALJ concluded Paulson is unable
17 to perform any of her past relevant work.  However, relying on the
18 VE's testimony, the ALJ found Paulson is able to perform other jobs
19 that exist in significant numbers in the national economy.  Even
20 though she cannot perform the full range of sedentary work, she
21 still could perform the requirements of representative occupations
22 such as cashier II (which the *DOT* classifies as unskilled, light
23 work, but the VE, in his "expert opinion," classified as
24 sedentary); product assembler; and hand packager. (A.R. 28)  The
25 ALJ therefore concluded Paulson was not disabled from May 28, 2008,
26 through the date of his decision. (*Id.*)
27 / / /
28 / / /

43 - FINDINGS & RECOMMENDATION

1        **IV.   STANDARD OF REVIEW**

2        The court may set aside a denial of benefits only if the

3 Commissioner's findings are "'not supported by substantial evidence

4 or [are] based on legal error.'"   *Bray v. Comm'r of Soc. Sec.*

5 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*

6 *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*

7 *V. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1

8 (9th Cir. May 20, 2011).   Substantial evidence is '"more than a

9 mere scintilla but less than a preponderance; it is such relevant

10 evidence as a reasonable mind might accept as adequate to support

11 a conclusion.'"   *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,

12 1039 (9th Cir. 1995)).

13        The court "cannot affirm the Commissioner's decision 'simply

14 by isolating a specific quantum of supporting evidence.'"   *Holohan*

15 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*

16 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).   Instead, the court

17 must consider the entire record, weighing both the evidence that

18 supports the Commissioner's conclusions, and the evidence that

19 detracts from those conclusions.   *Id.*   However, if the evidence as

20 a whole can support more than one rational interpretation, the

21 ALJ's decision must be upheld; the court may not substitute its

22 judgment for the ALJ's.   *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

23 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

24

25        **V.   DISCUSSION**

26        Paulson argues the ALJ erred in finding her complaints not to

27 be fully credible, not giving her husband's testimony greater

28 weight, and rejecting the opinions of her treating and examining

1  sources.  Dkt. #19.  The Commissioner disagrees, arguing substan-
2  tial evidence supports the ALJ's findings.  Dkt. #21.

3
4                    **A.  ALJ's Credibility Finding**

5      Paulson argues the ALJ improperly rejected her subject
6  complaints, finding them to be less than fully credible.  She
7  argues the ALJ failed to comply with the requirements of Social
8  Security Ruling (SSR) 96-7p, and applicable case law.  Dkt. #19,
9  pp. 6-9.

10     The Ninth Circuit Court of Appeals repeatedly has explained
11 the requirements for an ALJ to reject a claimant's testimony
12 regarding the severity of her symptoms.  Once the claimant has
13 produced objective medical evidence which reasonably could be
14 expected to produce "some level of symptoms," and as long as there
15 is no evidence of malingering, the "'ALJ can reject the claimant's
16 testimony about the severity of her symptoms only by offering
17 specific, clear and convincing reasons for doing so.'"  *Murray v.*
18 *Apfel*, 210 F.3d 384 (Table), 2000 WL 5936 at *1 (9th Cir. Jan. 4,
19 2000) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.
20 1996); citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)
21 (same)).  It is legal error for an ALJ to discredit a claimant's
22 testimony about the intensity and persistence of pain or other
23 symptoms, or the limitations caused by those symptoms, solely for
24 lack of supporting objective medical evidence.  *Hubble v. SSA*, 290
25 Fed. Appx. 56, 2008 WL 3307144 at *1 (9th Cir. July 17, 2008)
26 (citing *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986), *superseded*
27 *by statute on other grounds as stated in Bunnell v. Sullivan*, 912
28 F.2d 1149 (9th Cir. 1990)); *see also* SSR 96-7p, 1996 WL 374186 at

45 - FINDINGS & RECOMMENDATION

1  *1.  SSR 96-7p, cited by Paulson, similarly requires the ALJ to
2  cite "specific reasons for the finding on credibility, supported by
3  the evidence in the case record, and . . . sufficiently specific to
4  make clear to the individual and to any subsequent reviewers the
5  weight the [ALJ] gave to the individual's statements and the
6  reasons for that weight."  SSR 96-7p, 1996 WL 374186.

7      Paulson argues she has met the *Cotton* requirements, which the
8  Ninth Circuit has described as "(1) producing objective evidence of
9  an impairment; and (2) demonstrating that the impairment could
10 reasonably be expected to produce the symptoms alleged; [and] there
11 was no evidence of malingering[.]"  *Hubble*, 2008 WL 3307144 at *1
12 (citing *Dodrill*, 12 F.3d at 918).  She argues the ALJ erred because
13 he failed to provide the required "clear and convincing" reasons to
14 discredit her testimony.

15     The ALJ found Paulson met the *Cotton* requirements; he spe-
16 cifically found objective evidence of her impairments, and that her
17 "medically determinable impairments could reasonably be expected to
18 cause some of the alleged symptoms[.]"  (A.R. 22)  Further, the ALJ
19 made no finding of malingering, and he accorded "great weight" to
20 Dr. Westfall's observation that "the fact [Paulson's] physicians
21 keep prescribing narcotic pain medication to her lends credence to
22 her complaints[.]"  (A.R. 25)  Thus, the ALJ could only reject
23 Paulson's testimony regarding the severity of her symptoms by
24 making "specific findings stating clear and convincing reasons for
25 doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996)
26 (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)).  The
27 ALJ was required to "state specifically which symptom testimony is
28

1 not credible and what facts in the record lead to that conclusion."
2 *Id.*

3       The ALJ reviewed Paulson's subjective complaints, and noted he
4 had reduced Paulson's RFC to accommodate limitations resulting from
5 her various impairments.  He then stated, "However, the undersigned
6 cannot find the claimant's allegations that she is incapable of all
7 work activity to be credible because of the lack of objective
8 medical evidence."  (A.R. 23)  While SSR 96-7p directs the ALJ to
9 consider the degree to which the claimant's statements are
10 consistent with the objective medical evidence of record, the
11 Ruling specifically prohibits an ALJ from disregarding a claimant's
12 subjective complaints solely because of "the lack of objective
13 medical evidence":

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence. . . . *An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.*

24 SSR 96-7p, 1996 WL 374186 at *1 (emphasis added).

25       Here, however, the ALJ *did not* reject Paulson's subjective
26 testimony *solely* on the basis of the lack of objective evidence.
27 The ALJ correctly noted that subjective complaints, standing alone,
28 are not "conclusive evidence of disability."  (A.R. 23)  The

47 - FINDINGS & RECOMMENDATION

1  regulations specify that an impairment must be verifiable by
2  "medical evidence consisting of signs, symptoms, and laboratory
3  findings, not only by [the individual's] statement of symptoms[.]"
4  20 C.F.R. § 416.908; *see* A.R. 23 (citing same).   Indeed, the
5  regulations require that for subjective complaints of pain and
6  other symptoms to be determinative, they must be reasonably
7  consistent with objective medical evidence. 20 C.F.R. § 416.929(a)
8  ("[S]tatements about your pain or other symptoms will not alone
9  establish that you are disabled; there must be medical signs and
10 laboratory findings which show that you have a medical impair-
11 ment(s) which could reasonably be expected to produce the pain or
12 other symptoms alleged and which, when considered with all of the
13 other evidence (including statements about the intensity and
14 persistence of your pain or other symptoms *which may reasonably be*
15 *accepted as consistent with the medical signs and laboratory*
16 *findings*), would lead to a conclusion that you are disabled."
17 Emphasis added.); *see* A.R. 23 (citing same).

18     The ALJ cited specific evidence to support his credibility
19 determination.   He noted Paulson's symptoms, particularly her
20 coccyx pain, have been present since at least 2006, and she has
21 been treated with narcotic pain medications since that time, but
22 nevertheless, she continued to work until she was laid off in May
23 2008. Her MRI and x-ray studies over the years have failed to show
24 any remarkable findings to substantiate or explain the degree of
25 pain she alleges.   Range-of-motion testing of her shoulders and
26 neck have been largely unremarkable, as well.   Yet, rather than
27 simply rejecting Paulson's subjective complaints out of hand, the
28 ALJ gave her the benefit of the doubt and took her complaints into

consideration in determining Paulson's RFC, including restrictions
to account for her limitations.

The court finds the ALJ complied with the SSR, the applicable
regulations, and case law interpreting them.  He provided clear,
convincing reasons for discounting Paulson's subjective complaints
and finding them not to be fully credible.  The Commissioner's
decision on this point should be affirmed.

### B.   *Third-Party Testimony*

Paulson argues the ALJ erred in failing to discuss how
Paulson's symptoms, as observed and reported by her husband, would
limit Paulson's ability to work.  "Lay testimony as to a claimant's
symptoms is competent evidence that an ALJ must take into account,
unless he or she expressly determines to disregard such testimony
and gives reasons germane to each witness for doing so." *Lewis v.
Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citing *Nguyen v. Chater*,
100 F.3d 1462, 1467 (9th Cir. 1996), in turn citing *Dodrill v.
Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993)).

Here, the ALJ found Charles Paulson's testimony "credible to
the extent that he has accurately reported what he has seen, what
has been exhibited to him, and what he has been told.  [However,]
[w]hile he is credible, behavior exhibited or symptoms reported by
a subject are not an adequate basis to establish disability."
(A.R. 24)  Instead of giving "reasons germane to" Charles to
justify discounting his testimony, the ALJ stated, "In finding
[Paulson] is not precluded from performing basic work activity, the
undersigned is more persuaded by the opinions from medical
professionals who are trained to evaluate impairments and their

49 - FINDINGS & RECOMMENDATION

impact on functional capacity." (A.R. 24-25)  This justification

is inadequate as a matter of law.  Not only must the ALJ provide

reasons germane to Charles Paulson, the ALJ's reasons "must be

specific." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009)

(citing *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) ("the

ALJ, not the district court, is required to provide specific

reasons for rejecting lay testimony")).  The *Bruce* court made it

clear that an ALJ must "consider and comment upon competent lay

testimony, as it concern[s] how [the claimant's] impairments impact

[her] ability to work."  *Bruce*, 557 F.3d at 1115-16.  The

applicable regulation explains that the testimony of non-medical

sources, such as a spouse, is competent evidence regarding how the

severity of a claimant's impairments affects the claimant's ability

to work.  20 C.F.R. § 404.1513(d)(4).

Nevertheless, the undersigned finds the ALJ's error was

harmless, in that it was "'inconsequential to the ultimate non-

disability determination' in the context of the record as a whole."

*Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) (quoting

*McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011)).  Spe-

cifically, the symptoms and limitations about which Charles Paulson

testified mirrored Paulson's own testimony about her limitations -

testimony the court has found the ALJ properly rejected based on

clear and convincing reasons.  "[A]n ALJ's failure to comment upon

lay witness testimony is harmless where 'the same evidence that the

ALJ referred to in discrediting [the claimant's] claims also

discredits [the lay witness's] claims.'"  *Id.* at 1122 (quoting

*Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)).  "Because

the ALJ had validly rejected all the limitations described by the

1  lay witness in discussing [the claimant's] testimony, we are
2  confident that the ALJ's failure to give specific . . . reasons for
3  rejecting the lay testimony did not alter the ultimate nondisa-
4  bility determination.  Accordingly, the error was harmless."  *Id.*
5  Thus, the ALJ's failure to give appropriate reasons for rejecting
6  Charles Paulson's testimony does not require remand for further
7  consideration of that testimony.  *See id.*

8

9                    *C.  Weight Given to Physicians' Opinions*

10      Paulson argues the ALJ erred in failing to give greater weight
11  to the opinions of her "Treating And Examining Physicians."  Dkt.
12  #19, p. 11.  She cites case law regarding the weight to be given to
13  the opinion of a treating *physician*, but the only opinion to which
14  she refers is that of PA Macdonald.  While the observations of a
15  physician's assistant may be considered by an ALJ in determining
16  the severity of a claimant's impairments, only "acceptable medical
17  sources" may "provide evidence to establish an impairment."  20
18  C.F.R. § 404.1513(a).  An ALJ may disregard the opinions of a
19  physician's assistant if the ALJ "'gives reasons germane to each
20  witness for doing so.'"  *Turner v. Comm'r*, 613 F.3d 1217, 1224
21  (citing *Lewis*, 236 F.3d at 511).

22      Here, the ALJ considered PA Macdonald's progress notes from
23  her treatment of Paulson, but with regard to her opinion that
24  Paulson is "disabled," the ALJ noted PA Macdonald, herself,
25  acknowledged "she is not trained to complete the 'tests of func-
26  tional capacity.'"  (A.R. 26)  The ALJ noted the record evidence
27  does not support PA Macdonald's report that Paulson suffers from
28  muscle weakness.  (*Id.*)  The court agrees that PA Paulson was not

51 - FINDINGS & RECOMMENDATION

1   qualified to express an opinion regarding Paulson's functional

2   abilities in the workplace.

3        Further, even an opinion from one of Paulson's treating

4   physicians that she is "disabled" would not automatically have

5   resulted in a determination that Paulson is disabled.  The deter-

6   mination of disability is expressly reserved to the Commissioner,

7   as one of the "administrative findings that are dispositive of a

8   case[.]"  20 C.F.R. § 404.1527(d)(1).  As such, the Commissioner

9   gives no "special significance" to such an opinion.  20 C.F.R.

10  § 404.1527(d)(3).

11       The court finds the ALJ did not err in failing to give greater

12  weight to PA Macdonald's opinion that Paulson is disabled.  The

13  Commissioner's decision should be affirmed on this point.

14

15                          *VI.   CONCLUSION*

16       For the reasons discussed above, I recommend the Commis-

17  sioner's decision be affirmed.

18

19                       *VII.   SCHEDULING ORDER*

20       These Findings and Recommendations will be referred to a

21  district judge.  Objections, if any, are due by **February 11, 2013.**

22  If no objections are filed, then the Findings and Recommendations

23  will go under advisement on that date.  If objections are filed,

24  then any response is due by **February 28, 2013.**  By the earlier of

25

26

27

28

52 - FINDINGS & RECOMMENDATION

1  the response due date or the date a response is filed, the Findings

2  and Recommendations will go under advisement.

3      IT IS SO ORDERED.

4                              Dated this 23rd day of January, 2013.

5

6                              /s/ Dennis J. Hubel

7                              _____
                               Dennis James Hubel
8                              Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

53 - FINDINGS & RECOMMENDATION